UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Plaintiff,

        v.

SANTO C. MAGGIO,

                              Defendant.

07 CV 11388

ECF CASE

DEC 1 9 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"), alleges as follows:

### SUMMARY

1.     The Commission brings this case for violations of the federal securities laws by Santo C. Maggio ("Maggio"), a former senior executive of Refco Inc. and its corporate predecessor, Refco Group Ltd. (hereinafter, together referred to as "Refco"). From at least 1998 to October 2005, Maggio played a significant role in helping Phillip R. Bennett ("Bennett"), Refco's former chairman and chief executive officer, implement a fraudulent scheme that periodically concealed hundreds of millions of dollars of related party receivables. The receivables were owed to Refco by Refco Group Holdings, Inc. ("RGHI"), a non-Refco entity that Bennett controlled. In 2004 and 2005, Maggio also assisted Bennett in certain practices that inflated Refco's reported financial results.

2.  The related party receivables were concealed by a series of short-term loans that temporarily transferred the receivables to third parties immediately prior to the end of a Refco fiscal period. A few days after the fiscal period ended, the transactions were reversed, and the receivables were transferred back to RGHI.

3.  Maggio was the principal person overseeing the transactions that concealed the receivables. He participated in meetings with Bennett and others at which the transactions were discussed. He made arrangements with many of the third parties that temporarily assumed the receivables at the end of a Refco fiscal period. He also executed some of the documents involved in the transactions and directed that entries be made to Refco's books and records effectuating the transactions. Finally, he provided false and misleading information about the receivables to Refco's public accountant.

4.  To make Refco more attractive to potential investors, Bennett instituted additional practices that artificially enhanced Refco's financial results. These practices involved Refco recording fictitious interest income and income from fictitious foreign exchange trades. Maggio assisted Bennett in carrying out these practices.

5.  By engaging in this conduct, Maggio violated the antifraud, falsification of records, and lying to auditors provisions of the federal securities laws, and he aided and abetted Refco's violations of the periodic reporting and books and records provisions. The Commission requests, among other things, that this Court permanently restrain and enjoin Maggio from further violations of the federal securities laws as alleged in this Complaint. The Commission also requests that this Court issue an order pursuant to Section 20(e) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. § 78u(d)(2)] prohibiting Maggio from acting as an officer or a director of any public company.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Maggio, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

8. Certain of the acts, practices, and courses of conduct constituting the violations of law alleged herein occurred within this judicial district.

9. Maggio, directly and indirectly, has engaged in, and unless restrained and enjoined by this Court will continue to engage in the acts, practices, and courses of business alleged herein, or in acts, practices, and courses of business of similar purport and object.

## DEFENDANT

10. Defendant Santo C. Maggio, 56, resides in Naples, Florida. He joined Refco Group Ltd. in 1985. In 1991, Maggio became executive vice president of Refco Group Ltd. and president and chief executive officer of Refco Securities, LLC, the company's regulated broker-dealer subsidiary. In 2001, Maggio also became president and chief executive officer of Refco Capital Markets, Ltd., an unregulated, offshore Refco subsidiary involved in derivatives and foreign exchange trading. In August 2005, Refco Inc. became the corporate successor to Refco Group Ltd., and Maggio continued in these positions. On October 10, 2005, Refco placed Maggio on an

indefinite leave of absence. Maggio's employment with Refco was subsequently terminated in May 2006.

## RELEVANT ENTITIES AND INDIVIDUAL

11. Refco Group Ltd. was a Delaware limited liability company with its headquarters in New York City. The company was a major provider of execution and clearing services for exchange-traded derivatives and of prime brokerage services in the fixed income and foreign exchange markets. It held regulated commodities and securities brokerages. As part of a reincorporation conducted in preparation for its August 10, 2005, initial public offering of common stock, Refco Inc. became the corporate successor to Refco Group Ltd. After the offering, Refco's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78*l*(b)] and traded on the New York Stock Exchange. Press reports regarding the RGHI receivables and their periodic concealment began to appear on October 10, 2005. On October 13, 2005, the New York Stock Exchange halted trading in Refco's common stock, and on October 17, 2005, Refco filed for protection under Chapter 11 of the U.S. Bankruptcy Code. On October 18, 2005, Refco's common stock was delisted. Refco's fiscal year ended at the end of February.

12. Phillip R. Bennett joined Refco in 1981. Beginning in September 1998, Bennett was chief executive officer and president of Refco and chairman of its board of members. After Refco's August 2005 initial public offering of common stock, Bennett continued to serve as chief executive officer and chairman of the board of directors. On October 10, 2005, Refco placed Bennett on an indefinite leave of absence. Bennett subsequently resigned from Refco in January 2006.

13. Refco Group Holdings, Inc. is a closely held Delaware corporation. It is not, and was not, a subsidiary of Refco. At all relevant times for this Complaint, Bennett owned a substantial interest in RGHI. From approximately August 1999 to August 2004, Bennett owned 50 percent of RGHI. Subsequent to August 2004, Bennett completely owned RGHI. At all relevant times for this Complaint, RGHI held a substantial ownership interest in Refco.

## FACTS

### Concealment of Related Party Receivables

14. Beginning in the mid-1990's, Refco accrued significant, uncollectible receivables resulting from trading losses incurred by customers to whom it had extended credit. During this time, Refco also incurred significant losses resulting from proprietary trading. Over time, the combined customer and proprietary trading losses came to aggregate several hundred million dollars, and eventually, in order to move the losses off the books of Refco, Bennett directed that they be transferred to RGHI. As a result, Refco held receivables from RGHI for hundreds of millions of dollars. Because of Bennett's executive positions at Refco and his ownership interest in Refco through RGHI, these transfers and the resulting receivables were related party transactions. Over time, the receivables came to include certain Refco operating expenses that were transferred to RGHI as well as the putative accumulated interest owed to Refco on the receivables.

15. The amount of the RGHI receivables fluctuated over time, growing at times to more than $1 billion. In February 2005, just prior to the end of Refco's fiscal year, the aggregate total of the receivables was approximately $525 million, and in August 2005, just prior to the end of Refco's second fiscal quarter, it was approximately $495 million.

16. Beginning in at least 1998, Refco, at Bennett's direction, began engaging in a series of short-term transactions that temporarily shifted the receivables from RGHI to third parties at the end of a Refco fiscal period. From February 1998 to February 2004, these transactions were implemented at the end of each of Refco's fiscal years. Beginning in May 2004, these transactions occurred at the end of each fiscal quarter as well.

17. In these transactions, Refco Capital Markets, Ltd. ("RCM"), an offshore Refco subsidiary that Maggio headed, made a loan to a third party in the days before the end of a Refco fiscal period. The third party, in turn, made a loan to RGHI in the same amount. RGHI then used the loan to pay down the receivables it owed Refco. Therefore, at the fiscal period-end, instead of a receivable from RGHI, Refco's books showed a receivable from the third party in the amount of the original loan. As part of these transactions, Refco provided the third party with a guaranty against a default by RGHI. Refco also provided the third party with an indemnification for any claims arising out of the loans. The loan that the third party made to RGHI carried a higher interest rate than the loan that RCM made to the third party. Thus, the transactions posed no economic risk to the third party and assured it of a profit.

18. A few days after the Refco fiscal period-end, the transactions were reversed, and the receivables owed to Refco by the third party shifted back to RGHI. In most instances, these transactions were accomplished solely through bookkeeping entries, and the only cash exchanged was the payment to the third party for the interest rate differential that made the loans profitable. The transactions lacked any legitimate business purpose and were designed solely to conceal the RGHI receivables at the ends of Refco fiscal periods.

19. The third parties participating in these transactions were often hedge fund clients of Refco. Since 1998, various third parties participated and, in some instances, the receivables were divided among and transferred to multiple third parties over a single period-end. From February 2000 through February 2005, Bank für Arbeit und Wirtschaft ("BAWAG"), an Austrian bank, also participated in similar transactions at Refco's fiscal year-ends.

20. Maggio was a key figure in the period-end transactions. He knew that the transactions were designed and intended to conceal the RGHI receivables. In early February, a few weeks prior to the end of the fiscal year, Maggio would regularly meet with Bennett and others to discuss the transactions. In these meetings, Maggio received schedules quantifying the balances of the RGHI receivables so that the requisite size of the transactions could be determined. Maggio often coordinated the transactions with the third parties who participated in them, and he served as a point of contact if they had questions. Maggio often provided the third parties with the loan agreements, promissory notes, guaranties, and indemnifications that were executed in the transactions. Maggio executed many of the loan agreements for RCM, and from 2003 on, the loan documents listed Maggio as the person to receive legal notices on behalf of Refco and RGHI. Finally, in some instances, Maggio signed documentation authorizing journal entries that implemented the transactions, and he directed others to make entries adjusting the RGHI receivables on Refco's books and records.

21. Maggio played a similar role in the fiscal year-end transactions involving BAWAG. He discussed the details of the transactions with BAWAG officials and employees. On many occasions, he provided instructions to BAWAG employees about the transactions or confirmed details, such as the loan amounts, interest rates, and dates on which funds were to be

exchanged. Maggio authorized wire transfers utilized in the transactions. In February 2004 and February 2005, Maggio signed letters to BAWAG stating that certain Refco funds on deposit at the bank could be retained by BAWAG in the event of a default by RGHI.

22. One of the period-end transactions occurred over Refco's May 31, 2005, fiscal quarter-end and temporarily shifted $450 million of the RGHI receivables to a third party. Thus, on or about May 25, 2005, RCM loaned $450 million to the third party. Maggio executed the agreement for the loan on behalf of RCM. At the same time, the third party loaned $450 million to RGHI. The interest rate on that loan was 75 basis points higher than the interest rate on the loan from RCM to the third party. Bennett executed the agreement for the loan that RGHI received from the third party. Finally, Refco provided the third party with a guaranty against a default by RGHI and an indemnification for any claims arising out of the loans. Bennett executed the guaranty and the indemnification.

23. RGHI used the May 25 loan from the third party to pay down the receivables it owed to Refco. On or about June 6, 2005, after the quarter-end, the transactions were reversed, and the receivables shifted back to RGHI.

24. On May 25, 2005, Maggio signed a management representation letter concerning the financial statements of RCM. The letter was provided to Refco's public accountant in connection with that firm's audit of the financial statements of Refco for the fiscal year ended February 28, 2005. The letter contained several false statements, including representations that related party transactions had been "properly recorded or disclosed in the consolidated financial statements" and that management had "no knowledge of fraud or suspected fraud affecting the Company."

8

## Inflation of Refco's Financial Results

25. Bennett's exit strategy contemplated selling Refco to an investment group or entity, and perhaps ultimately taking the company public. To make Refco more attractive to potential investors, Bennett orchestrated practices that inflated Refco reported financial results in 2005.

26. Bennett set aggressive internal projections for Refco's financial performance. A daily report was prepared and distributed to Bennett and a small group of Refco executives, including Maggio. The report compared Refco's actual performance to its internal earnings forecast. Bennett and Maggio met quarterly to assess whether Refco's results needed to be adjusted to eliminate budget shortfalls. In some periods in which Refco's actual performance fell short of its forecast, Maggio helped Bennett carry out the practices that inflated Refco's results.

27. One way in which Bennett and Maggio inflated Refco's results was to record fictitious interest income, purportedly due Refco from the RGHI receivables. Beginning in at least 1998, interest on the RGHI receivables was manipulated for the purpose of improving Refco's results. For example, on or about February 11, 2005, Maggio directed that interest due Refco from RGHI on the receivables be increased by $12 million in order to help eliminate a shortfall in projected earnings. The adjustment increased Refco's revenue by $12 million, while RGHI's debt to Refco increased by an identical amount.

28. Maggio also assisted Bennett in enhancing Refco's results by recording fictitious foreign exchange transactions between RGHI and RCM. In these transactions, Maggio directed that entries be recorded showing that RGHI had "purchased" a foreign currency from RCM at the currency's high for the day and then "sold" the currency back to RCM at the currency's low for

the day. In some instances, fictitious trading tickets were generated and initialed by Maggio. The sham trades resulted in gains to RCM, while RGHI reported the losses. For example, on or about February 17, 2005, Maggio directed approximately thirty-two fictitious foreign exchange transactions between RGHI and RCM involving Euros, British pounds, Swiss franks, and Japanese yen. The transactions resulted in Refco recognizing $5 million in revenue, while RGHI recorded a $5 million loss. Similar fictitious foreign exchange transactions were carried out in August 2004, October 2004, and November 2004.

### False and Misleading Filings

29.   In August 2004, Thomas H. Lee Partners, L.P. and its affiliates and co-investors acquired approximately 57 percent of Refco, pursuant to a leveraged recapitalization. To fund the recapitalization, Refco issued a private offering circular placing $600 million of senior subordinated notes. Refco subsequently exchanged the notes for senior subordinated notes registered pursuant to a Registration Statement on Form S-4 that the Commission declared effective on April 8, 2005. The registration of the notes required Refco to file certain information and reports with the Commission. On July 1, 2005, Refco filed an annual Report on Form 10-K for its fiscal year ended February 28, 2005, and on July 15, 2005, it filed a quarterly Report on Form 10-Q for its fiscal quarter ended May 31, 2005. Refco subsequently commenced the initial public offering of its common stock pursuant to a Registration Statement on Form S-1 that the Commission declared effective on August 10, 2005.

30.   Pursuant to the federal securities laws, Refco was required to disclose as related party transactions in its registration statements the RGHI receivables, the transactions moving the receivables from RGHI over the fiscal period-ends, the transactions returning the receivables to

RGHI after the fiscal period-ends, and Refco's guaranties and indemnifications of the third-party loans to RGHI during its fiscal years ended February 28, 2003; February 29, 2004; and February 28, 2005. The annual report was required to disclose those receivables, transactions, guaranties, and indemnifications for Refco's fiscal year ended February 28, 2005. The registration statements and the annual report failed to make these required disclosures.

31.     The financial statements included in Refco's registration statements, annual report, and quarterly report contained additional material misstatements or omissions relating to the receivables. The financial statements included a line item for "receivables from equity members." For Refco's fiscal year ended February 28, 2005, and its fiscal quarter ended May 31, 2005, the filings showed a zero balance for the "receivables from equity members" line item, despite the fact that, at those period-ends, Refco had engaged in transactions that temporarily moved hundreds of millions of dollars of the RGHI receivables to third parties. Showing a zero balance for receivables from equity members as of those period-ends failed to reflect the economic realities concerning the RGHI receivables.

32.     Generally accepted accounting principles required Refco to disclose material related party transactions in the financial statements contained in its registration statements, annual report, and quarterly report. The notes to the financial statements contained in these filings did not accurately disclose the existence of the RGHI receivables or quantify their amount. Moreover, the financial statements did not disclose the transactions moving the receivables from RGHI over the fiscal period-ends, the transactions returning the receivables to RGHI after the fiscal period-ends, and Refco's guaranties and indemnifications of the third-party loans to RGHI.

33. Refco's registration statements, annual report, and quarterly report also materially misstated members' equity. The RGHI receivables derived largely from cumulative bad debt and trading losses that had not properly flowed through Refco's income statement as period losses and, therefore, had not impacted members' equity. Instead of recording the receivables in the equity portion of its balance sheet as an obligation owed by Bennett, which would have lowered "members' equity" by a like amount, Refco recorded the receivables as "receivables from customers," thereby significantly overstating the amount of members' equity it reported. For example, proper treatment of the RGHI receivables would have resulted in members' equity of approximately negative $375 million as of February 28, 2005, rather than the positive balance of approximately $150 million that Refco falsely reported in its annual report and in its Registration Statement on Form S-1.

34. Finally, as a result of fictitious interest income and sham foreign exchange trading income, Refco materially misstated the revenue and income that it reported in its Registration Statement on Form S-1 and in its annual report for its fiscal year ended February 28, 2005.

## FIRST CLAIM FOR RELIEF

### FRAUD

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)],
Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)],
and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

35. Paragraphs 1 through 34 are realleged and incorporated herein by reference.

36. As set forth above, Maggio, directly or indirectly, acting knowingly or recklessly, by use of the means or instrumentalities of interstate commerce, or by the use of the mails or of the facilities of a national securities exchange, in connection with the offer, purchase, or sale of

securities has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of an untrue statement of a material fact or an omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

37.     By reason of the foregoing, Maggio violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### REPORTING VIOLATIONS

**Aiding and Abetting Violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. § 240.15d-2 and 240.15d-13]**

38.     Paragraphs 1 through 34 are realleged and incorporated herein by reference.

39.     Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and rules promulgated thereunder require that a registrant with a registration statement declared effective pursuant to the Securities Act, but which does not have a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*], file with the Commission certain information, documents, and reports that accurately reflect the registrant's financial performance and provide other information to the public.

40. As a consequence of Maggio's conduct, as set forth above, Refco's annual Report on Form 10-K for its fiscal year ended February 28, 2005, and its quarterly Report on Form 10-Q for its fiscal quarter ended May 31, 2005, violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13].

41. Maggio knowingly, or recklessly, provided substantial assistance to Refco in the commission of these violations.

42. By reason of the foregoing, Maggio aided and abetted Refco's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13].

## THIRD CLAIM FOR RELIEF

### RECORDKEEPING VIOLATIONS

**Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]
and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]
and Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act
[15 U.S.C. § 78m(b)(2)(A)]**

43. Paragraphs 1 through 34 are realleged and incorporated herein by reference.

44. The Exchange Act requires issuers who are required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets. The Exchange Act and rules promulgated thereunder prohibit persons from, directly or indirectly, falsifying any book, record, or account described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

45.     As a consequence of Maggio's conduct, as set forth above, Refco's books and records were falsified in violation of Sections 13(b)(2)(A) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

46.     By reason of the foregoing, Maggio knowingly violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

47.     Maggio knowingly, or recklessly, provided substantial assistance to Refco in its violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

48.     By reason of the foregoing, Maggio aided and abetted Refco's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## FOURTH CLAIM FOR RELIEF

### MISSTATEMENTS TO AUDITORS

**Violation of Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)]**

49.     Paragraphs 1 through 34 are realleged and incorporated herein by reference.

50.     Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] prohibits an officer or director of an issuer from, directly or indirectly, making or causing to be made a materially false statement or omitting or causing to be omitted a statement of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading to an accountant in connection with an audit, review, or examination of an issuer's financial statements required to be made by the Exchange Act, or the preparation or filing of a document or report required to be filed with the Commission.

51. By reason of the foregoing, Maggio violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A. Permanently restraining and enjoining Maggio from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules 10b-5, 13b2-1, and 13b2-2(a) [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2(a)], and from aiding and abetting violations of Sections 13(b)(2)(A) and 15(d) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13];

B. Prohibiting Maggio, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

C.   Granting such other relief as this Court may deem just and appropriate.

Dated: Washington, D.C.
       December 19, 2007

Respectfully submitted,

_____
Robert B. Blackburn (RB 1545)
Local Counsel

Securities and Exchange
  Commission
3 World Financial Center
Suite 400
New York, N.Y. 10281-1022
(212) 336-1050

_____
James A. Kidney (JK-5830)
Scott W. Friestad
David Frohlich
Stephen E. Jones

Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
(202) 551-4441 (Kidney)
(202) 772-9246 (Kidney fax)

17